**Ralph SCHMITZ, et al., Appellants,**

v.

**RINKE, NOONAN, SMOLEY, DETER, COLOMBO, WIANT, VON KORFF AND HOBBS, LTD. d/b/a Rinke Noonan, Respondent.**

No. A09–1282.

Court of Appeals of Minnesota.

June 29, 2010.

Stephen F. Rufer, Pemberton, Sorlie, Rufer & Kershner, P.L.L.P., Fergus Falls, MN, for appellant.

Richard J. Thomas, Corinne Ivanca, Burke & Thomas, PLLP, St. Paul, MN, for respondent.

Considered and decided by STONEBURNER, Presiding Judge; TOUSSAINT, Chief Judge; and CONNOLLY, Judge.

## OPINION

CONNOLLY, Judge.

Appellants sued respondent for legal malpractice in a transactional matter. Appellants challenge the district court's grant of judgment as a matter of law at the close of their case in chief. Respondent in turn challenges the district court's denial of its pretrial motion for summary judgment. Because respondent was entitled to judgment as a matter of law following the close of appellants' case in chief and was also entitled to summary judgment because appellants failed to establish an element of their malpractice claim, we affirm the district court's grant of judgment as a matter of law and reverse its denial of summary judgment.

## FACTS

Appellants Ralph Schmitz and his company, James Development Firm (collectively Schmitz) were represented by respondent Rinke, Noonan, Smoley, Deter, Colombo, Wiant, Von Korff and Hobbs, Ltd. (Rinke Noonan). John Babcock, an attorney at Rinke Noonan, was the primary attorney working on the transaction out of which the litigation underlying this legal-malpractice suit arose. In June 2001, Schmitz and Robert Johnson signed a letter of agreement, whereby Schmitz agreed to sell Johnson his membership interest in 18 limited-liability companies (LLCs) for $1.77 million. The LLCs owned general-partnership interests in 18 limited-liability partnerships, which in turn owned various apartment buildings that provided low-income housing.

At an August 9, 2001 meeting, U.S. Bank denied the approval apparently needed for the transaction to proceed. Johnson was required to obtain the lender's approval by September 15, 2001. Johnson's purchase of Schmitz's membership interest ultimately failed and resulted in Johnson suing Schmitz for breach of contract, which was followed by Schmitz suing Rinke Noonan for legal malpractice. Schmitz's claims against Rinke Noonan relate to two events: (1) an August 15, 2001 letter sent by Schmitz to Johnson's agent and (2) Schmitz and Rinke Noonan's failure to respond to an August 23, 2001 letter sent by Johnson's attorney to Babcock.

*Schmitz's August 15, 2001 Letter*

The first incident forming the basis of Schmitz's malpractice action is the August 15 letter that Schmitz sent to John Ahern "in regrets [sic] to discontinuing the sell [sic] of my interest in my Apartment Portfolio." Ahern was Johnson's agent. The letter stated that the problem with U.S. Bank's lack of approval would frustrate Schmitz's purpose in making the sale, and that there were too many unknowns in Johnson's new proposal. It further stated, "I also feel it is in the best interest of our company not to go forward with the sale at this time." This was different than the proposed draft Babcock had sent to Schmitz by e-mail, which was shorter, focused on U.S. Bank's lack of approval, and expressed regret at the inevitability of "not get[ting] the required approvals."

At trial, Babcock testified that he cautioned Schmitz not to send a letter and that it would have been more prudent to simply let the agreement expire in September. Schmitz testified that Babcock never advised him not to send the letter. Because the district court granted judgment as a matter of law in Rinke Noonan's favor, we assume that the disputed factual issue would have been resolved in Schmitz's favor. *See Unborn Child by Wilcox v. Evans*, 310 Minn. 197, 211, 245 N.W.2d 600, 608 (1976). Schmitz's August 15 letter was later held to be a repudiation of his contract with Johnson. Schmitz's argument pertaining to this letter is that Babcock deviated from the standard of care by failing to clearly advise him not to send the letter because it could be con-

strued as a breach of contract and created the potential for significant liability.

*Soule's August 23, 2001 Letter*

The second incident forming the basis of Schmitz's malpractice action focuses on Babcock's response to the reply letter from Johnson's attorney. In response to Schmitz's August 15 letter, Johnson's attorney Gregory Soule sent a letter to Babcock on August 23. The letter "strongly urge[s] that [Schmitz] return to negotiations with Mr. Johnson, and make the accommodations required by the permanent lender, given that Mr. Schmitz is obligated to do so pursuant to the various agreements described above." Soule asserted that Schmitz's August 15 letter was a "repudiation of his obligations." Soule also asserted that Schmitz was in violation of various contractual obligations to help Johnson obtain a loan. Babcock drafted two responses to the August 23 Soule letter and sent these to Schmitz on August 30 and September 6. Babcock's drafted response was apparently never sent to Soule or Johnson.

The gravamen of Schmitz's claims against Rinke Noonan in relation to the August 23 letter is that Babcock failed to warn Schmitz of the risks that became apparent upon receipt of Soule's letter and failed to recommend prudent courses of action. For example, Schmitz alleges that Babcock should have stressed the need for successful negotiations with Johnson after that point. Schmitz claims that Babcock also should have suggested initiating an action in district court that would either declare Schmitz's contract with Johnson invalid and unenforceable or else order specific performance by the parties. Schmitz also claims that Babcock's failure to provide appropriate advice was due, at least in part, to Rinke Noonan's undisclosed conflict of interest arising out of its representation of U.S. Bank. Schmitz alleges that Rinke Noonan withdrew its representation of him, but failed to inform him that it was doing so.

*The Underlying Litigation*

Following the exchange of these letters, Schmitz did continue to negotiate with Johnson, but a deal was never finalized. In June 2003, Schmitz sold a one-half interest in all 18 of the LLCs to an investment group headed by Jan Susee. In July 2003, Johnson sued Schmitz for breach of contract. In that case, the district court issued an order denying Schmitz's motion for summary judgment and ruling that Schmitz prematurely terminated or repudiated the contract by his August 15 letter. The district court subsequently issued an order granting Johnson's motion for summary judgment, dismissing Schmitz's counterclaim with prejudice, and reserving for trial the issues of damages and causation. Schmitz settled the underlying Johnson litigation for $1 million; he also accumulated $178,282.65 in attorney fees.

*The Instant Litigation*

In June 2007, Schmitz sued Rinke Noonan for malpractice, alleging that the law firm's negligence concerning Schmitz's sale of the 18 LLCs caused him to incur damages. Schmitz subsequently submitted expert affidavits stating that the case had been reviewed with expert witness John Mulligan, who opined that Schmitz's damages could have been avoided or mitigated by an appropriate response to Soule's August 23 letter. Mulligan opined that reasonable responses would have included reviving the Johnson agreement, negotiating more seriously with Johnson, initiating a declaratory-judgment action, and bringing suit seeking specific performance. Rinke Noonan moved for summary judgment, arguing in relevant part that Mulligan failed to offer an opinion regarding but-for causation and that Mulligan's opinion concerning proximate cause amounted to pure speculation. Schmitz then submitted a supplemental expert affidavit opining that,

but for Rinke Noonan's failure to take appropriate action, Johnson would not have sued Schmitz. The district court denied Rinke Noonan's motion for summary judgment.

The case proceeded to trial in May 2009. Schmitz presented witness testimony from himself; Susee; Mulligan; Thomas Melloy, an attorney who represented Schmitz in the underlying litigation and settlement with Johnson; and Babcock. At the close of Schmitz's case in chief, Rinke Noonan moved for judgment as a matter of law, which the district court granted. The district court stated that the claim pertaining to Schmitz sending the August 15 letter failed because there was no expert testimony establishing the standard of care or Babcock's deviation therefrom. With respect to the allegations centering on failure to advise Schmitz of risks and alternatives upon receipt of Soule's August 23 letter, as well as Rinke Noonan's failure to adequately handle the conflict of interest identified in September, the district court stated that but-for causation was not established as a matter of law for two reasons. First, Mulligan provided no opinion testimony as to causation, in accordance with the ruling that his testimony would have been overly speculative and was therefore inadmissible. Second, Schmitz's testimony that he would have attempted to negotiate a resolution of the matter with Johnson provided no evidence of what the terms of a renegotiated deal would have been, and thus the jury could only have engaged in "rank speculation."

This appeal follows.

### ISSUES

I. Did the district court err in granting respondent's motion for judgment as a matter of law at the close of appellant's case in chief?

II. Did the district court err in denying respondent's pretrial motion for summary judgment?

### ANALYSIS

#### I.

Schmitz challenges the district court's grant of judgment as a matter of law at the close of his case in chief, both with respect to the claim arising out of the August 15 letter and with respect to the claim arising out of the response to the August 23 letter and failed subsequent negotiations.

Before submission of the case to the jury, a district court may grant a motion for judgment as a matter of law against a party with respect to a claim that cannot be maintained without a favorable finding on an issue that lacks a legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue. Minn. R. Civ. P. 50.01. "Viewing the evidence in a light most favorable to the nonmoving party, this court makes an independent determination of whether there is sufficient evidence to present an issue of fact for the jury." *Jerry's Enters., Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 711 N.W.2d 811, 816 (Minn.2006). This court must disregard any harmless error. Minn. R. Civ. P. 61.

■ In an action for legal malpractice arising out of representation in a transactional matter, the plaintiff must prove four elements: (1) an attorney-client relationship; (2) acts constituting negligence or breach of contract; (3) that such acts proximately caused the plaintiff's damages; and (4) that but for the defendant's conduct, the plaintiff would have obtained a more favorable result in the underlying transaction than the result obtained.[1] *Jer-*

---

1. In legal-malpractice cases involving damage to or loss of a cause of action, the fourth

element requires the plaintiff to show that but

*ry's*, 711 N.W.2d at 816, 819. Failure to provide sufficient evidence to meet any element is fatal to the whole claim. *Id.* at 816.

Attorneys have a duty to exercise reasonable care in their representation of their clients. *Id.* at 817. Whether the standard of care has been breached is a question of fact. *Id.* at 820. "Expert testimony is generally required to establish the standard of care applicable to an attorney whose conduct is alleged to have been negligent, and further to establish whether the conduct deviated from that standard." *Id.* at 817 (quotation omitted). Expert testimony is also needed to show that the attorney's negligence proximately caused the plaintiff's damages. *Fontaine v. Steen*, 759 N.W.2d 672, 677 (Minn.App. 2009). The testimony of an expert witness is required when a claim involves "complicated issues of causation and damage." *Thomas A. Foster & Assocs., Ltd. v. Paulson*, 699 N.W.2d 1, 8 (Minn.App.2005). But-for causation cannot be established without the assistance of an expert witness "when the causal relation issue is not one within the common knowledge of laymen." *Walstad v. Univ. of Minn. Hosps.*, 442 F.2d 634, 639 (8th Cir.1971) (applying Minnesota law).

## A. The August 15 Letter

We first consider the district court's grant of judgment as a matter of law with respect to Babcock's alleged failure to clearly advise Schmitz not to send the August 15 letter because the letter created a risk of liability. The district court held that Rinke Noonan was entitled to judgment as a matter of law because Schmitz failed to produce expert opinion testimony establishing a departure from the standard of care.

for the defendant's conduct the plaintiff would have been successful in the action.

Schmitz argues that expert testimony was not needed, relying on *Hill v. Okay Construction Co.*, which holds that the general rule requiring expert testimony is subject to an exception "in cases where the conduct complained of can be evaluated adequately by a jury in the absence of expert testimony." 312 Minn. 324, 337, 252 N.W.2d 107, 116 (1977). "The exception is for the 'rare' and 'exceptional' case." *Fontaine*, 759 N.W.2d at 677 (quoting *Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 191 (Minn. 1990)). This court reviews de novo whether expert testimony is needed to establish a prima facie case of legal malpractice. *Id.* at 676.

Schmitz contends that expert testimony was not needed in this case because the standard of care required Babcock to clearly advise Schmitz not to send the August 15 letter, and that the jury did not need an expert to explain that Babcock did not make clear this advice to Schmitz. If the standard of care were established and the only issue were whether Babcock's communications to Schmitz clearly indicated that sending the August 15 letter was inadvisable, the jury would have been capable of independently evaluating whether Babcock deviated from the standard of care. But this does not resolve the question of whether expert testimony was needed to (1) establish the standard of care or (2) demonstrate that Babcock's alleged negligence caused Schmitz's damages.

A professional's admission that he had a responsibility to act in a certain way "is not sufficient to establish that as the standard of care which he has a legal duty to use." *Gabrielson v. Warnemunde*, 443 N.W.2d 540, 545 (Minn.1989). Such an

*Togstad v. Vesely, Otto, Miller & Keefe*, 291 N.W.2d 686, 692 (Minn.1980).

admission indicates a personal feeling of obligation to perform duties at a potentially higher level of skill and competence than required by the exercise of reasonable care; it does not establish that the professional should be legally held to that standard of conduct. *Id.*

Schmitz argues that Babcock's trial testimony established the standard of care. We disagree. When questioned by Schmitz's counsel, Babcock testified that he advised Schmitz not to send the August 15 letter. Asked whether he "believed [he] had a duty to give that advice," Babcock responded that he "felt it was a mistake to send the letter." After Babcock explained why sending the letter was not advisable, he was again asked, "And you felt you had a duty to give him that advice at that time?" Babcock's response again did not use the word "duty," but did reiterate that he should have given (and appropriately did give) that advice: "I felt that was the best advice, that was my advice, my best advice." He then responded affirmatively to the question whether he had a duty to clearly communicate about that advice with Schmitz.

This issue is on all fours with *Gabrielson*. There is no expert testimony establishing a standard of care, but only Babcock's admission that he believed he was obligated to advise Schmitz not to send the letter. Babcock's testimony is not sufficient to establish the standard of care under the circumstances: what action would have been taken by a reasonably prudent attorney exercising ordinary skill and care under the circumstances. *See id.* It is possible that reasonable responses by Babcock could have included advising Schmitz not to send the letter, but also editing the letter in such a way as to reduce the risks it posed to Schmitz. More than one reasonable response may have been open to Babcock, which is precisely why Schmitz

should have produced expert testimony explaining the standard of care.

Assuming that Babcock's testimony did establish the standard of care, Babcock's own testimony indicated that he met this standard of care by advising Schmitz not to send the letter. Schmitz testified that Babcock never told him that sending the letter was a bad idea, and that he should not do so. The record also contains an August 13 e-mail from Babcock to Schmitz saying "Ralph [Schmitz], think about sending a letter like this to John Ahern. It is very short and sweet. You would sign the letter. Let me know what you think." We note that Babcock's proposed letter was shorter, more cautiously worded, and less antagonistic than the version sent by Schmitz. But from this evidence, the jury could have found that Babcock did not clearly warn Schmitz against sending the letter. However, in light of our holding that Babcock's testimony did not establish the standard of care, as well as the absence of any expert testimony on that issue, we conclude that Schmitz failed to produce sufficient evidence to create a fact question for the jury regarding whether Babcock acted negligently.

Although the district court's grant of judgment as a matter of law in regard to the malpractice claim arising out of the August 15 letter was based on Schmitz's failure to produce sufficient evidence that Babcock's actions departed from the standard of care, Rinke Noonan further contends that Schmitz's claim fails as a matter of law because the evidence produced was insufficient to establish a prima facie case on the element of but-for causation. We agree. Schmitz asserts that "Babcock testified that Schmitz would have been much better off if that letter had not been sent," arguing that this testimony created evidence of but-for causation. The testimony cited by appellant is Babcock's affirmative

response to Schmitz's trial counsel's question whether Babcock believed that "the agreement would have just expired on its own terms," that appellant's "position would have been much stronger if he hadn't sent the letter," and that "sending the letter gave them, Johnson, the argument that [Schmitz] had broken the agreement." Babcock was then asked if Schmitz "wouldn't have been in the Johnson lawsuit" if Schmitz had not sent the August 15 letter. Babcock replied, "I have no idea."

Schmitz argues that the jury could have reasonably inferred that Babcock's advice not to send the August 15 letter would have resulted in Schmitz not sending the letter, which in turn would have resulted in the contract expiring on its own terms, and that Johnson therefore would not have brought suit. One obvious flaw in this line of reasoning is that Babcock did not testify that Johnson would not have sued Schmitz in the absence of the August 15 letter, but instead responded that he did not know. In fact, there is no evidence in the record indicating that Johnson would not have sued. Schmitz apparently believes that the jury should have been entitled to speculate that the underlying litigation would not have occurred.

 "When applying the 'but for' test, we must envision what would have occurred but for the negligent conduct." *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 812 (Minn.App.2007), *review denied* (Minn. Sept. 18, 2007). Showing that "many positive things *could* have occurred" but for the negligent conduct is not enough; instead, the plaintiff must "introduce concrete evidence of what [the plaintiff] would have done but for [the defendant's] negligence and what those actions would have reasonably produced." *Id.* at 813. As Rinke Noonan correctly notes, Schmitz did not actually testify that he would not have sent the letter if Babcock had advised him not to. More importantly, there is no evidence regarding how Johnson would have acted had he not received the letter, and any conclusion that he would not have sued Schmitz for breach of contract is purely speculative. Further, to recover for legal malpractice, the plaintiff needs to produce expert testimony as to causation. *Fontaine*, 759 N.W.2d at 677. Schmitz produced no expert testimony on causation.

In sum, Schmitz was required to produce expert testimony establishing the standard of care and Babcock's alleged deviation therefrom. Schmitz did not do so, and his claim concerning the August 15 letter fails for this reason. Schmitz was also required to produce expert testimony on the issue of but-for causation, which he did not do. Schmitz produced no testimony from which the jury could have reasonably concluded that, but for Babcock's allegedly negligent failure to warn him not to send the letter, he would have obtained a better result in the underlying transaction. The district court therefore did not err in granting judgment as a matter of law in favor of Rinke Noonan with respect to Schmitz's claim arising out of the August 15 letter.

## B. The August 23 Letter

 We now consider the district court's grant of judgment as a matter of law with respect to Schmitz's malpractice claim arising out of Babcock's receipt of Soule's August 23 letter.

Schmitz argues that the district court erred in granting judgment as a matter of law based on his failure to show but-for causation. According to Schmitz, Babcock failed to respond to Soule's August 23 "threatening demand letter." Schmitz contends that Rinke Noonan acted as it did because it developed an undisclosed conflict due to its representation of U.S.

Bank. With respect to but-for causation, Schmitz contends there was sufficient evidence because (1) Schmitz testified that he would have acted differently had he been made aware of the problem; (2) Schmitz rejected specific opportunities to resolve the matter with Johnson; (3) Schmitz testified that if he had been properly advised of the risks, he would have taken the advice and would have either renegotiated or piecemealed the deal in accord with the new Ahern proposal; and (4) Mulligan testified that if negotiations had failed, the matter should have been taken to court by Schmitz in a declaratory-judgment action.

Schmitz points to what he terms "three concrete opportunities" to resolve the matter. First, he claims he could have accepted Johnson's August 13, 2001 proposal, which was communicated by Ahern. This is a letter discussing possible ways to move money around to achieve U.S. Bank approval. At trial, Schmitz testified that he would have considered the proposal more seriously if Babcock had properly advised him of his situation. This is not tantamount to stating that he would have accepted the Ahern proposal on the terms offered. We are also skeptical that Ahern's August 13 letter, which specifically anticipates "the plan's refinement" after creative contributions by all parties, can be construed as a firm offer that Schmitz was capable of accepting at the outset. But even assuming this to be the case, Schmitz's August 15 letter breaching the underlying agreement, and Soule's August 23 letter recognizing it as such, show that the Ahern's August 13 letter was no longer an offer capable of being accepted by Schmitz.

Second, Schmitz contends he could have accepted an August 26 offer of purchase. The record contains an August 26, 2002 "letter of agreement" addressed to Schmitz and signed by "Senior 42, LLC, Mike McMurray, Manager" as buyer and listing Schmitz as seller. This exhibit was discussed by the district court and Schmitz's attorney on the record at trial. Schmitz's attorney stated that even though Johnson was not a party to this deal, Ahern was behind the deal, and "if [Schmitz] had gone back to Johnson or Ahern and said, you know, is this going to be okay with Johnson, I think he would have been just fine." But Schmitz's trial counsel agreed that the offer was not from Johnson. Schmitz cites no evidence that Johnson would have released his claims against Schmitz as part of the August 26 offer to Schmitz from Senior 42. Here, too, Schmitz testified that he would have more seriously considered further negotiation in response to this offer if he had been properly advised by Babcock, but did not testify that he would have accepted the offer.

Third, Schmitz argues that he lost his opportunity to continue negotiating with Johnson by selling a one-half interest in the LLCs to Jan Susee, since after that point he would have needed the agreement and participation of Susee, his 50% partner. Schmitz contends that this impeded his ability to negotiate a sale or release with Johnson. Again we observe that Schmitz's testimony never indicated what terms he would have been willing to accept if he had been more motivated to seriously negotiate with Johnson.

We find no evidence in the record as to what terms Johnson would have been willing to accept in a deal prior to ultimately settling the underlying litigation with Schmitz for $1 million. Essentially, Schmitz's evidence on but-for causation is limited to his testimony that he would have been more motivated to negotiate and that he would have attempted to negotiate a deal or settlement. This is similar to *Christians,* in which we held that broad assertions that "action" would have been

taken and problems "rectified" failed to produce sufficient evidence of factual causation. 733 N.W.2d at 813. A jury would not be entitled to presume that those efforts would have resulted in a more beneficial outcome. *Id.* As a matter of law, but-for causation is not shown by "speculative potential outcomes." *Id.*

Schmitz contends that the instant case is closer to *Jerry's,* in which the supreme court held that Jerry's presented sufficient evidence to create a fact question regarding whether Jerry's would have obtained a more favorable result in the transaction but for the alleged negligence of its law firm, Larkin Hoffman. 711 N.W.2d at 820. In that case, Jerry's had purchased two separate parcels of undeveloped land from two sellers. *Id.* at 815. One of the parcels included a buy-back option allowing the seller to purchase the entire property if Jerry's did not begin construction of improvements on that seller's property within two years of the sale. *Id.* Larkin Hoffman never discussed the survival of the buy-back option with Jerry's. *Id.* The seller exercised the buy-back option before the parties ultimately reached a settlement allowing Jerry's to retain ownership. *Id.* at 815–16. The president of Jerry's specifically testified at trial that if he had known of the possible survival of the buy-back option, the company would have started construction within two years to ensure that the option was extinguished. *Id.* at 820. Because here Schmitz had no power to unilaterally negotiate a more favorable deal with Johnson, we conclude that *Jerry's* is distinguishable.

Additionally, Schmitz's testimony never indicated exactly what terms he would have agreed to if he had been properly informed and thus more eager to negotiate. This problem is compounded by the fact that he presented no evidence of what terms Johnson would have agreed to. Any determination of damages would be purely speculative. As this court has recognized, damages are intertwined with causation. *See Bryan v. Kissoon,* 767 N.W.2d 491, 496 (Minn.App.2009). Schmitz needed to present competent evidence sufficient to permit a reasonable jury to conclude that but for Babcock's negligence he would not have sustained damages, or else would have sustained damages in a lesser amount. Instead, he only presented evidence that he would have had a greater incentive to negotiate with Johnson. With no evidence tending to show what would have been the outcome of his more-highly-motivated negotiations, the jury would have been left to impermissibly speculate as to potential outcomes.

Rinke Noonan also urges this court to affirm on the theory that the district court could or should have properly ruled that these "renegotiation" claims failed as a matter of law because appellant failed to present expert testimony on but-for causation. The district court ruled that Schmitz's expert could not testify as to causation because the testimony would have been too speculative, and Schmitz does not challenge this ruling. Expert testimony is required in a legal-malpractice action to show whether the defendant's departure from the standard of care caused the plaintiff's damages. *Fontaine,* 759 N.W.2d 672; *see also Brown–Wilbert, Inc. v. Copeland Buhl & Co.,* 732 N.W.2d 209, 218 (Minn.2007). Because there is no expert testimony in the record, judgment as a matter of law was also warranted on this ground.

## II.

■ Because Rinke Noonan also sought review of the district court's denial of its pretrial motion for summary judgment, we now consider this decision. As a threshold matter, we must determine whether the district court's denial of sum-

mary judgment is within our scope of review, since matters outside the scope of review are not properly considered by appellate courts. *See Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 917 (Minn.2009).

In *Bahr*, the supreme court emphasized that an appellate court only has the authority to review orders that "affect" the judgment being appealed under Rule 103.04 of the Minnesota Rules of Civil Appellate Procedure. *Id.* at 918. The supreme court explained that a "district court's conclusion ... that there was a genuine dispute of fact becomes moot once the jury reaches a verdict on that issue." *Id.* The supreme court held that the district court's denial of summary judgment based on its finding of a factual issue is outside of an appellate court's scope of review where a trial has been held and the parties have been given a full and fair opportunity to litigate their claims. *Id.* at 918–19. However, the supreme court specifically did not decide whether Minnesota courts should also apply the same rule when the district court's denial of summary judgment was "based on a legal conclusion on an issue that is not presented to the jury for determination." *Id.* at 918 n. 9. Because *Bahr* dealt with denial of summary judgment based on a determination that there was sufficient evidence in the record at the summary-judgment stage to create a fact issue for the jury, the case did not present the question of whether denial of summary judgment based on a question of law falls within the scope of review on appeal from the judgment. *Id.*

In contrast, the instant case squarely presents such a question. A plaintiff bringing a legal-malpractice action must produce expert affidavits sufficient to establish a prima facie case. *See* Minn.Stat. § 544.42 (2008). Application of Minn.Stat. § 544.42 presents a question of law. *See Noske v. Friedberg*, 713 N.W.2d 866, 872 (Minn.App.2006), *review denied* (Minn.

July 19, 2006). The legal sufficiency of Schmitz's expert affidavits therefore presents a question of law. *See id.*

The *Bahr* court recognized a split in authority concerning the appellate reviewability of a denial of summary judgment following the presentation of evidence. 766 N.W.2d at 918 n. 9. For example, the Eighth Circuit has declined to adopt a distinction between a summary judgment denied on factual grounds and one denied on legal grounds. *Metro. Life Ins. Co. v. Golden Triangle*, 121 F.3d 351, 355 (8th Cir.1997). In contrast, the Sixth Circuit has held that it will review a denial of summary judgment based on a question of law rather than the presence of material disputed facts. *United States ex rel. A + Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 441 (6th Cir. 2005). The Sixth Circuit explained that the policy underlying the rule seeks to protect against depriving a party of a fact-finder's factual determinations "on the basis of an appellate court's review of whether the pleadings and affidavits at the time of the summary judgment motion demonstrated the need for a trial." *Id.* (quotation omitted). It concluded that this policy is not implicated by reviewing a denial of summary judgment that was based on a question of law. *Id.* We find the Sixth Circuit's reasoning persuasive and hold that the district court's denial of respondent's summary-judgment motion in this case is within our scope of review.

We now turn to the question of whether the district court erred in denying Rinke Noonan's pretrial motion for summary judgment. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to judgment as a

matter of law." Minn. R. Civ. P. 56.03. Appellate courts generally review de novo whether the district court erred in its application of law and whether there were any genuine issues of material fact when viewing the evidence in the light most favorable to the nonmoving party. *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76–77 (Minn.2002). In this case, because the scope of review precludes consideration of whether the evidence was sufficient to create a fact issue, *see Bahr*, 766 N.W.2d at 918, our review is limited to whether the district court erred in its application of the law.

At the time Rinke Noonan moved for summary judgment and through the time of the district court's denial of the motion, all of Schmitz's malpractice theories related to Babcock's advice and actions in regard to the August 23 Soule letter and Rinke Noonan's conflict of interest; no claim was made with respect to Schmitz's August 15 letter. In its memorandum in support of its motion for summary judgment, Rinke Noonan argued that summary judgment was proper because Schmitz's expert disclosure offered no testimony as to but-for causation and that the expert disclosure as to proximate cause was purely speculative.

Schmitz's first two affidavits of expert review identified Mulligan as the expert witness and alleged that the underlying contract between Schmitz and Johnson was "capable of being legally terminated" by Schmitz, and that Babcock should have advised Schmitz to do so, which would have prevented Johnson from having a viable claim against Schmitz. Mulligan reasoned that Schmitz's August 15 letter was unilateral and therefore could not have been effective to terminate the contract. Although the letter was determined in the underlying litigation to be a repudiation of the contract, Mulligan asserted that this outcome was unforeseeable. In Mulli-

gan's opinion, Schmitz had various options following receipt of Soule's August 23 letter, including continuing to negotiate with Johnson, determining whether Johnson was able to perform the conditions imposed on him by the contract, seeking specific performance, or initiating a declaratory-judgment action to ascertain whether the contract was binding at that time. Mulligan claimed that a declaratory judgment action "could have" determined whether Johnson was capable of performance, as a result of which the parties either would have performed or the court would have declared the contract to be null and void. Mulligan opined that the costs incurred by Schmitz in litigating and settling the Johnson litigation were "caused by" Babcock's breach of the standard of care, which required Babcock to "recommend[ ] a prompt resolution of the issue" as to whether the contract remained in force.

Schmitz later submitted a supplemental expert affidavit, in which Mulligan opined that Rinke Noonan "should have advised Schmitz to revive the contract" following receipt of the Soule letter. Mulligan reiterated that Rinke Noonan should have advised Schmitz to initiate a declaratory-judgment action before conveying a one-half interest in the LLCs to Susee. With respect to but-for causation, Mulligan opined that "[b]ut for [Rinke Noonan's] failure to take action to legally resolve [Schmitz's] exposure under the contract with Johnson to sell the portfolio, [Schmitz] would not have been subject to the Johnson lawsuit in 2003." The basic theory was that Johnson would not have sued for damages if Schmitz had sought a legal determination of the rights and duties of the. parties, if the contract had been terminated, or if specific performance had been ordered.

Rinke Noonan's reply memorandum in support of its motion for summary judg-

ment again stressed the speculative, conjectural nature of the theory of causation set forth in the supplemental expert affidavit as well as the affidavit's failure to show that but for Babcock's conduct, Schmitz would have received a better result in the underlying matter. Rinke Noonan argued that the claim that Babcock should have advised Schmitz to revive the agreement with Johnson was purely speculative and therefore inadmissible. Rinke Noonan pointed out that Schmitz continued to negotiate with Johnson, but failed to reach a deal and instead sold a share of the LLCs to Susee. Rinke Noonan also observed that even if Schmitz had brought an unsuccessful declaratory-judgment action and decided to sell to Johnson, there was no evidence that Johnson would have agreed to particular terms or any terms. Rinke Noonan further contended that the remedy of specific performance would not have been available to a court because an adequate remedy at law existed.

In October 2008, the district court issued an order denying Rinke Noonan's motion for summary judgment. It concluded that Mulligan's opinions expressed in Schmitz's expert affidavits were not too broad and conclusory to fail as a matter of law at the summary-judgment stage. The district court noted Mulligan's opinion that "a lawsuit may not have been necessary to resolve the matter in 2001" and that the underlying dispute "could have been resolved" if Schmitz withdrew his repudiation and allowed the agreement to lapse because Johnson was unable to obtain bank approval. The district court observed that damages may have been too speculative to prove, but concluded that Schmitz's expert affidavits were sufficient-

ly probative with respect to causation to survive summary judgment.

We have already held that, as a matter of law, the allegations involved in this legal-malpractice action required Schmitz to produce expert testimony as to but-for causation. *See, e.g., Paulson,* 699 N.W.2d at 8; *Walstad,* 442 F.2d at 639. A claim of legal malpractice fails when the plaintiff fails to establish any element, including causation. *Jerry's,* 711 N.W.2d at 816. A plaintiff must produce an expert affidavit setting forth "the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion" sufficient to establish a prima facie case. *See* Minn.Stat. § 544.42, subds. 4(a), 6.

▆▆ Expert affidavits must make "far more" than mere general disclosures. *Lindberg v. Health Partners, Inc.,* 599 N.W.2d 572, 578 (Minn.1999).[2] If the affidavits contain "nothing more than broad and conclusory statements as to causation," they are legally insufficient to satisfy the professional-malpractice statute. *Id.* Expert affidavits "must provide more than a sneak preview" of the plaintiff's case. *Teffeteller v. Univ. of Minn.,* 645 N.W.2d 420, 430 (Minn.2002). "The gist of expert opinion as to causation is that it explains to the jury the 'how' and the 'why' the malpractice caused the injury." *Id.* at 429 n. 4. Conclusory statements are insufficient to establish a prima facie case. *Maudsley v. Pederson,* 676 N.W.2d 8, 14 (Minn.App. 2004). When a question involves matters outside of ordinary lay knowledge, the expert must offer testimony based on an adequate factual foundation showing that the complained-of act caused the harm at issue, or else the jury would be left to

---

**2.** Although *Lindberg* was a medical-malpractice case, because the provisions for expert review and identification are "nearly identical" in the statutes pertaining to medical mal-

practice and legal malpractice, cases involving medical malpractice are instructive in cases involving legal malpractice. *Fontaine,* 759 N.W.2d at 676.

impermissibly speculate as to causation. *Gross v. Victoria Station Farms, Inc.*, 578 N.W.2d 757, 762 (Minn.1998).

In this case, Schmitz's expert affidavits setting forth Mulligan's opinion were speculative and conjectural with respect to causation. Mulligan's opinion amounted to a bare assertion that but for Babcock's allegedly inadequate response to Soule's letter, Johnson would not have sued. Mulligan's theory that negotiations would have led to a superior agreement or settlement between Schmitz and Johnson lacked an adequate foundation and was hopelessly speculative, since it was not based on knowledge of what terms the parties would have agreed to if Schmitz had been more highly motivated to negotiate. Similarly, the claim that a declaratory-judgment action brought by Schmitz would have led to a conclusion other than the one ultimately reached in the underlying litigation—that Schmitz's August 15 letter was an anticipatory repudiation of the agreement—amounts to nothing more than speculation and conjecture.

 Additionally, we find no merit in Mulligan's argument that an action brought by Schmitz would have resulted in a court ordering specific performance by the parties. Specific performance is not an available remedy where there is an adequate remedy at law. *Shaughnessy v. Eidsmo*, 222 Minn. 141, 150, 23 N.W.2d 362, 368 (1946). Mulligan did not explain how or why damages would not have been an adequate remedy for Schmitz's breach of contract. Further, the injured party is the one who may elect whether to seek an equitable or legal remedy. *Lloyd v. Farmers Coop. Store of Cleveland*, 197 Minn. 387, 389, 267 N.W. 204, 205 (1936); *see also Loppe v. Steiner*, 699 N.W.2d 342, 349 (Minn.App.2005) (holding that injured party was entitled to seek specific performance and, alternatively, damages if specific performance were not available). Mulligan did not attempt to explain why Johnson would have abandoned a claim for damages, and any claim that Johnson would have done so is mere speculation.

We conclude that Schmitz's expert affidavits failed to set forth a prima facie case of legal malpractice. Specifically, Mulligan's opinions on the issue of causation were speculative, lacking in foundation, and based on erroneous interpretations of Minnesota law. We therefore hold that the district court erred in denying Rinke Noonan's pretrial motion for summary judgment.

## DECISION

In this legal-malpractice case, the district court did not err in granting judgment as a matter of law because Schmitz produced no expert testimony at trial establishing that Babcock departed from the standard of care with regard to the August 15 letter, and presented no expert or otherwise sufficient testimony as to but-for causation. The district court did not err in granting judgment as a matter of law regarding Schmitz's allegations pertaining to Soule's August 23 letter because Schmitz presented no expert testimony on but-for causation and the only causation evidence he produced was highly conjectural and speculative. We therefore affirm the district court's grant of judgment as a matter of law at the close of Schmitz's case in chief.

Further, we hold that Rinke Noonan's request for review of the district court's denial of its pretrial motion for summary judgment is within the scope of review because the district court denied summary judgment as a matter of law, not based on the existence of material facts later submitted to a fact-finder. Because Schmitz's

expert affidavits were insufficient as a matter of law, the district court erred by denying summary judgment. We therefore reverse the district court's denial of Rinke Noonan's pretrial motion for summary judgment.

**Affirmed in part and reversed in part.**